Filed 2/5/26  In re Matthew M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Matthew M. et al., Persons Coming Under the Juvenile Court Law. | B345129, B345960<br><br>(Los Angeles County Super. Ct. No. 21LJJP00385A–B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATTHEW M.,<br><br>    Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Stephanie M. Davis, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Matthew M. (father) appeals from an order of the juvenile dependency court denying his petition seeking further reunification services pursuant to Welfare and Institutions Code section 388,[1] and an order selecting a permanent plan of legal guardianship and terminating dependency jurisdiction over father's two children. We find no error and affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral regarding then-five-year-old Matthew and three-year-old Samantha. The caller reported that father hit the children and spanked them hard every day, father and mother physically fought in the children's presence, the parents abused drugs, and Matthew had started threatening to kill himself.

In an ensuing investigation, DCFS learned that father had been diagnosed with bipolar disorder and was not taking his medication. He had a history of abusing drugs, including methamphetamine. Family members described seeing father excessively punish the children, including by slapping Samantha for failing to brush her teeth properly. The children described seeing mother and father fighting. They both told social workers about an incident during which mother had a taser and father hit

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

mother's arm or hand with a baseball bat, causing her to bleed. Paternal relatives reported that father had grabbed Matthew by the arm and dislocated his shoulder; spanked Matthew so hard that he was unable to walk; and screamed at the children.

The parents admitted the taser and baseball bat incident and that some other domestic violence had occurred. Father denied excessively punishing the children. He admitted that he was diagnosed with bipolar disorder and that he was not taking medication. He also admitted having a history of methamphetamine and marijuana use, but he denied currently using methamphetamine.

The children were detained in August 2021. Before the jurisdiction and disposition hearing, DCFS reported that father yelled and was under the influence during visits with the children. At one visit, father yelled at the paternal great-grandfather. Later that day he tested positive for methamphetamine. The children told a social worker they did not want to speak with father because he screamed a lot. Paternal family members had reported father for elder abuse, and the paternal grandmother told DCFS that father had bought a gun. Both parents missed multiple drug tests.

In December 2021, the juvenile court sustained a petition alleging the children were persons described by section 300, subdivisions (a), (b), and (j), based on father's physical abuse of the children, the parents' violent altercations in the presence of the children, the parents' substance abuse, and the parents' mental and emotional problems. The juvenile court asserted dependency jurisdiction over the children and removed them from the parents' custody. The court ordered DCFS to provide

reunification services.[2]  Father was ordered to participate in a substance abuse program, submit to drug testing, participate in a 12-step program, complete a DCFS-approved domestic violence program, and receive mental health and individual counseling. The court ordered DCFS to refer father to a dual diagnosis program.  Father was to have monitored visits.

Over the next year, father participated in some services and regularly visited the children.  However, family members reported that he continued to exhibit aggressive behavior, including further violence with mother and threatening to kill the paternal grandmother.  Father tested positive for methamphetamine and marijuana several times in the first six-month review period or failed to test.  In the second six-month review period, father began consistently testing negative in late August 2022 but then tested positive for oxycodone in November 2022.

By the second six-month review hearing in late January 2023, the children had been out of the parents' custody for two days short of 18 months.  The juvenile court found that although father had made substantial "progress . . . toward alleviating or mitigating the causes necessitating placement," it "also had to consider that we are at the [section 366.22] date and there is no factual or legal basis for extending reunification services."  The court terminated reunification services for both parents and set a hearing to select and implement a permanent plan (366.26 hearing) for May 2023.

In January 2024, father filed a request for a modification of the court's orders pursuant to section 388 (388 petition).  Father

_____

[2]      Mother is not a party to this appeal.  We therefore discuss only the facts relevant to father.

4

asked the juvenile court to "reopen reunification services." His petition asserted that he had completed domestic violence classes, drug treatment and education programs, and counseling. He regularly attended 12-step meetings. The petition also asserted father visited the children regularly, he consistently had "high quality visits," and he and the children had a close bond. The juvenile court set the matter for hearing.

In June 2024, DCFS filed a response to father's 388 petition. The agency confirmed that father had completed services as he had reported, and that he was participating in individual counseling. Father told a social worker he had been advised he did not need psychotropic medication.

The children—now eight and six years old—made positive statements about father. They enjoyed visits with him. Yet, they were inconsistent in their responses about whether they would like to live with him. In one interview, when asked whether, if given the choice, he would stay with the caregiver or live with father, Matthew said: " 'I don't know, I like both . . . .' " In a subsequent interview, he said he would not want to live with father and wanted to stay with the caregiver. He said he remembered when father spanked him. In one interview, Samantha said if she had the choice, she would live with father. But in a later interview, she said she did not know if she wanted to live with father and that if she went back with him, she would be sad.

Samantha's therapist opined that Samantha displayed "consistent anxiety" about father and this made the therapist "nervous" for Samantha to return to his home. The therapist further opined that the bond between Samantha and the

caregiver was strong and it "would be a huge setback if Samantha were removed from the caregiver's home."

DCFS opined that the interactions between father and the children were positive and negative. The children were excited to see father and spend time with him. However, they were also at times defiant, yelled at father, and ignored him. DCFS noted that father had not addressed his bipolar disorder or drug tested to show that he had maintained his sobriety. He was living in his car.[3] DCFS advised the court: "Samantha refers to the caregiver as her mother and has expressed her desire to live with her forever. [The therapist] also reported the minor Matthew has expressed he does not want to move again and wants to live only with the caregiver." Ultimately the report opined: "The minors remaining in the caregiver[']s home is in their best interest. The minor[s] have a strong bond to the caregiver. It is the most consistent and stable plan for permanency." DCFS recommended that the court deny father's petition.

The section 388 and 366.26 hearings were continued for several months. In reports to the court, DCFS indicated that father was learning how to manage the children's behavior in a positive way. The children expressed their desire to continue living with the caregiver forever, but to have visits with father. In September 2024, Samantha's therapist reported that Samantha said she was excited for her visits with father, but that she also felt nervous because she wondered if he would "start hitting again." She "expressed anxiety because she remembers

---

[3] DCFS later learned that father had not been truthful and was in fact living with his girlfriend. He had not told social workers he was living with the girlfriend because he did not want DCFS to know about the infant they had together.

6

her dad punishing her and she is afraid he is going to do it again." Matthew also told a social worker he was worried that if he returned to father, father would hit him with a belt as he had in the past. Meanwhile, the children continued to thrive with the caregiver. She wished to adopt them.

Finally, in late January 2025, the section 388 and 366.26 hearings took place. As to the 388 petition, father's counsel indicated father was *not* asking the juvenile court to return the children to his custody. Instead, he asked only that the court provide him with further reunification services. Father's counsel argued that father had worked very hard and demonstrated he had changed. Counsel for DCFS and minors' counsel argued that the court should deny the petition.

The court acknowledged that father had "come a very long way," and was a "different person." However, the court noted the children were "still stuck in their trauma," and it would consider that they expressed legitimate worries about father. The court further indicated "there is work that [father] still needs to do." The court referred to a recent incident in which father had forced Matthew to eat ice cream that had fallen on the ground. The court noted the children were conflicted and it was not in their best interest to offer father additional reunification services when stability is what they needed.

The court thus denied father's 388 petition. As to the selection and implementation of a permanent plan, the court found that although the children were adoptable, the parental

benefit exception to adoption applied.[4]  The court thus ordered legal guardianship as the permanent plan.

Father appealed from the order denying his 388 petition. After the court subsequently signed the legal guardianship orders and terminated dependency jurisdiction, father appealed from those orders as well.

## DISCUSSION

### The Juvenile Court Did Not Abuse Its Discretion in Denying Father's 388 Petition

Father filed notices of appeal challenging both the order denying his 388 petition and the subsequent guardianship orders and order terminating dependency jurisdiction.  On appeal, however, his arguments relate only to the order denying the 388 petition.  Although we reject DCFS's argument that the appeal is moot, we find no basis for reversal.

### I.    Father's Appeal is Not Moot

DCFS contends this court should find father's appeal moot as he does not challenge the juvenile court orders establishing a legal guardianship over the children and terminating dependency jurisdiction.  DCFS argues that, with these orders in place, the juvenile court can no longer order DCFS to provide reunification services and this court cannot provide father any effective relief.

We disagree that the appeal is moot.  If the juvenile court had granted the 388 petition and ordered further reunification services, it could not have selected and implemented a permanent plan and could not have terminated dependency jurisdiction.  (*In re A.R.* (2009) 170 Cal.App.4th 733, 740 [" 'issue is not moot if the

---

[4]    The court did not take any additional evidence or hear further argument regarding the section 366.26 portion of the hearing.

purported error infects the outcome of subsequent proceedings' ”]; *In re Sean E.* (1992) 3 Cal.App.4th 1594, 1599 [once court granted 388 petition it should have set aside the previously scheduled 366.26 hearing].)  Father's appeal of those later orders preserved this court's ability to reverse the order denying the 388 petition and the subsequent orders that were the result of the 388 denial. (See *In re Rashad D.* (2021) 63 Cal.App.5th 156, 164–165 [mother challenged jurisdiction finding but did not appeal from orders terminating jurisdiction and awarding custody; appellate court therefore unable to provide effective relief]; *In re J.M.* (2020) 50 Cal.App.5th 833, 850–851 [reversal of order denying mother's 388 petition necessitated reversal of subsequent order terminating parental rights]; *In re J.S.* (2011) 199 Cal.App.4th 1291, 1295 [exit orders were direct result of juvenile court's denial of motion to dismiss dependency proceeding and were pending appeal; appeal therefore not moot].)

## II.    Applicable Legal Principles

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)  However, "[e]ven after the focus has shifted from reunification, [section 388] provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  Under section 388, a parent may petition the juvenile court to modify a prior order. The parent must show that there is new evidence or a change of

circumstances and that modification of the prior order is in the child's best interest.  (§ 388; *Stephanie M.*, at p. 317.)

"We review the court's best interest determination, the second step, for abuse of discretion and may disturb the exercise of that discretion only in the rare case when the court has made an arbitrary or irrational determination.  [Citations.]  We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court.  [Citation.]  We ask only whether the juvenile court abused its discretion with respect to the order it made." (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194–1195 (*Matthew M.*).)

## III.  Discussion

Father contends the juvenile court abused its discretion in determining that providing him additional reunification services would not be in the children's best interest.  He did not argue below, and does not argue on appeal, that the juvenile court should have returned the children to his custody.  Indeed, at the section 388 hearing, his counsel explicitly stated that father was not seeking the immediate return of the children to him.  Instead, father argues the progress he made in services "was a solid foundation for a healthy and stable continuing parental relationship with the children," and "[r]einstating services would have allowed this relationship to continue and flourish, fostering a sense of stability for the children and paving the way for a successful reunification, which would provide the children with permanency and stability with their father."

Father's argument ignores several critical aspects of this case and the permissible timeframes for reunification.  When a child older than three is removed from parental custody, a parent

10

is generally entitled to reunification services for 12 months from the date the child entered foster care.  (§ 361.5, subd. (a)(1)(A).)  Reunification services may be extended and provided for a *maximum* of 18 months after a child has been removed from parental custody.  (§ 361.5, subd. (a)(3)(A); *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625 (*Michael G.*).)  Under certain limited circumstances, none of which father argued applied here, the court may extend reunification services to 24 months from the date the child was removed from parental custody.[5] (§ 366.22, subd. (b)(1)–(2).)

As our high court has explained, the presumptive 18-month limit on reunification services "reflects a considered legislative choice: '[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate.' [Citation.]  If the child has already been out of the parent's custody for 18 months and still cannot be safely returned, the statute instructs that the court ordinarily must proceed to schedule a permanency planning hearing under section 366.26, at which the court decides whether to terminate parental rights and place the child for adoption or else select

---

[5]    With additional limitations, these circumstances require one of the following: 1) reasonable services have not been provided; 2) active efforts have not been made in the case of an Indian child; 3) the parent is making significant and consistent progress in a court-ordered residential substance abuse treatment program; 4) the parent was a minor or nonminor dependent at the initial hearing; or 5) the parent was recently discharged from incarceration, institutionalization, or immigration custody.  (§ 366.22, subd. (b)(1)–(2).)

another permanent plan." (*Michael G.*, *supra*, 14 Cal.5th at p. 627.)

Here, by the time father filed his 388 petition, the children had been out of father's physical custody for almost 30 months. He had received 18 months of court-ordered services and did not challenge the juvenile court's decision that the children could not be safely returned to his care. Although he had participated in additional services after the 18-month reunification period, in his 388 petition he asked only that the court order DCFS to provide him with more reunification services.

Father has not established that the juvenile court's order denying this request was an abuse of discretion. As noted above, once reunification services are terminated, the juvenile court's focus must turn to the child's needs for stability and permanence. Father did not demonstrate that starting a new period of reunification services and prolonging the children's time in foster care, rather than selecting and implementing a permanent plan, would promote stability and permanence for the children. Indeed, the juvenile court considered evidence that suggested the opposite.

While the children enjoyed visits with father, there was evidence that they had conflicting emotions at the prospect of living with him again. In the case of Samantha, her therapist reported Samantha experienced consistent anxiety about father and fear that he would physically abuse her again if she lived with him. Matthew likewise was afraid that father would hit him again. The children's bond with father was impaired by their still emotionally powerful recollections of the abuse they had suffered at his hands.

Moreover, father had not progressed beyond monitored visits.  Shortly before the section 388 and 366.26 hearing, there were concerns raised about father's conduct with Matthew at a recent visit.  There was no basis for the juvenile court to conclude that return of the children to father's custody would be imminent if the court ordered additional reunification services.  (See *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 [on eve of 366.26 hearing, prospect of additional six months of reunification services to see if mother would do what was required to regain custody would not promote children's stability and would not be in their best interests].)

Meanwhile, the children had developed a strong bond with the caregiver and wanted to live with her "forever."  By the hearing date, the children had been living with the caregiver for approximately three and a half years, beginning when Samantha was three years old (almost four), and Matthew was five years old.  Both children told social workers that they loved the caregiver and that she took good care of them.  They referred to her as their mother.  She had met all of their needs for years.  Although the disruption of a current placement is not dispositive, " ' "[w]hen [out-of-home] custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." [Citations.]' " (*In re I.B.* (2020) 53 Cal.App.5th 133, 159, quoting *Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

The juvenile court could reasonably determine that after being out of father's physical custody and in foster care for over three and a half years, it would not be in the children's best

13

interest to prolong their temporary placement in order to provide father with further services and the mere hope of eventual reunification.  The court was required to focus on the children's best interests, not to reward father with additional services to recognize his progress.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 528.)

Father contends the continuation of his relationship with the children is in their best interests.  Yet, the juvenile court—in conducting the section 388 and 366.26 hearing simultaneously—found the parental benefit exception to adoption applied, did not terminate father's parental rights, ordered legal guardianship as the permanent plan, and further ordered that father was to continue having visits.  The children's relationship with father was not severed.  Father argues that "continued contact" with him would promote the children's stability, but the juvenile court provided for continued contact in the form of visitation with father, while also allowing the children to have the stability of a secure and permanent placement.  The juvenile court reasonably determined that this resolution, rather than a new period of reunification services, promoted the children's best interests.

Father has not demonstrated that this was the "rare case when the court has made an arbitrary or irrational determination."  (*Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195.) We find no abuse of discretion.

14

## DISPOSITION

The juvenile court orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.